## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS (Central Division)

| | |
|---|---|
| **DOUGLAS W. CANADY,** | No. 4:21CV1203-BRW |
| **Plaintiff,** | District Judge assigned to District Judge Wilson |
| **v.** | Magistrate Judge: and to Magistrate Judge Volpe |
| **KEENAN WALLACE, and TIM RYALS,** | **CIVIL ACTION – LAW** **JURY TRIAL DEMANDED** |
| **Defendants.** | **FILED** U.S. DISTRICT COURT EASTERN DISTRICT ARKANSAS |

**COMPLAINT**

DEC 1 4 2021

TAMMY H. DOWNS, CLERK

By: _____ DEP CLERK

**AND NOW** come the Plaintiff, DOUGLAS W. CANADY, by and through his undersigned counsel, DEVON M. JACOB, ESQUIRE, and the law firm of JACOB LITIGATION, INC., and aver the following:

### Jurisdiction and Venue

1. This action is brought pursuant to 42 U.S.C. § 1983.

2. Jurisdiction is founded upon 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights and elective franchise) & 1367 (supplemental jurisdiction).

3. Venue is proper in this Court, as the cause of action arose in this District.

### Parties

4. Plaintiff, DOUGLAS W. CANADY ("CANADY"), is an adult individual, who during all relevant times, lived in Faulkner County, Arkansas.

5. Defendant, KEENAN WALLACE ("WALLACE"), is an adult individual, who during all relevant times, was employed by the Faulkner County Sheriff's Office, as a Deputy

1

Sheriff. All of WALLACE'S actions or inactions were taken under color of state law. WALLACE is sued in his individual capacity.

6.     Defendant, TIM RYALS ("RYALS"), is an adult individual, who during all relevant times, was the duly elected Sheriff of the Faulkner County Sheriff's Office. The Faulkner County Sheriff's Office is located at 801 Locust Street, Conway, AR 72034. RYALS is sued in his official capacity only.

## FACTS

### A.  WALLACE Shoots an "Aggressive" Dog

7.     On January 4, 2019, KEENAN WALLACE ("WALLACE") was a K9 officer, on duty, in full uniform, operating a marked patrol vehicle.

8.     WALLACE was dispatched to investigate a complaint of an aggressive dog on Antietam Drive, in the Shiloh Estates subdivision, in the City of Conway, Faulkner County, Arkansas.

9.     Upon arrival, WALLACE asked the owner of the dog, DOUGLAS W. CANADY ("CANADY"), who was standing on his property, to walk to the road to speak with him.

10.     When CANADY refused, WALLACE stated, "Okay, I am going to come to you. If your dog is aggressive, I am going to shoot it."

11.     Immediately thereafter, the dog barked at WALLACE, and WALLACE shot the dog in the head.

2

12.    The "aggressive" dog was a nine-pound chihuahua named Reeses.



13.    The bullet entered under Reeses' right eye and exited through her left mandible; shattering her jaw.

14.    After being shot, Reeses shrieked in pain and rolled around on the grass.

15.    When CANADY protested the shooting, WALLACE stated, "I told you," and then walked onto CANADY'S property, toward CANADY, demanding that CANADY speak with him.

16.    CANADY told WALLACE that he was going to call the sheriff and demanded that WALLACE leave his property.

17.    Fearing for his safety, CANADY backed away from WALLACE, while continuing to demand that WALLACE leave the property.

18.    WALLACE knew that CANADY had not engaged in criminal conduct and was not a threat to himself or others.

19.    Regardless, WALLACE pulled out his TASER, aimed it at CANADY, and demanded that CANADY "stay right here."

20.    WALLACE then grabbed CANADY'S arm.

21.    Regarding the shooting, WALLACE'S partner stated, "he has a right to protect himself."

3

### B. National Standards for Police Encounters with Canines and Available Free Training

22.     There exist recognized and professionally accepted best practices and industry standards for police encounters with canines.

23.     Since at least 2011, these accepted industry standards have been recognized at a national level.

24.     The Office of Community Oriented Policing Services ("COPS") through the U.S. Department of Justice has a complete training program available for free to all law enforcement personnel (and the general public) on its website.

25.     According to the industry standards, long standing documentation and records of injuries from dogs in the United States, dog bites that cause "serious bodily injury" are extremely rare, and fatalities are even rarer.

26.     According to the industry standards, the perception that a single dog presents a life-threatening danger to a healthy adult male who is wearing a thick uniform and bullet-proof vest, is objectively unreasonable, and it has been well-documented to be a false perception.

### C. Sheriff TIM RYALS Admits No Polices Violated

27.     Sheriff TIM RYALS ("RYALS") is the final policymaker for the Faulkner County Sheriff's Office, which is owned and operated by Faulkner County, Arkansas.

28.     Sheriff Ryals is the final decisionmaker regarding whether a sheriff deputy's conduct complies with agency policy.

29.     The criminal prosecutor is the final decisionmaker regarding whether a person will be criminally prosecuted.

4

30.     On January 5, 2019, Sheriff RYALS terminated WALLACE'S employment with the Sheriff's Office.

31.     Sheriff RYALS, however, admitted that WALLACE'S use of force in this instance did not violate the policies of the Faulkner County Sheriff's Office.

32.     Specifically, Sheriff RYALS posted a statement on the Sheriff Office's Facebook page, which provided in relevant part, the following:

> Over the last 24 hours, at my request, Faulkner County Investigators have been working diligently to investigate whether Deputy Wallace violated any state law or our agency's policies and procedures. While it appears no policies or laws were violated, I hold every employee within our agency to the highest of standards and will be forwarding the investigation to the Prosecuting Attorney's Office for further review.

33.     Stated another way, Sheriff RYALS admitted that the policy of the Faulkner County Sheriff's Office was to permit sheriff deputies to shoot pet dogs that were located on private property and that did not present as a credible threat to anyone.

34.     Moreover, Sheriff RYALS admitted that the policy of the Faulkner County Sheriff's Office was to permit sheriff deputies to point TASER'S at persons who did not present as a threat to themselves or others and who were not being lawfully arrested.

35.     Furthermore, Sheriff RYALS admitted that the policy of the Faulkner County Sheriff's Office was to permit sheriff deputies to make warrantless arrests that were not supported by probable cause.

36.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

5

a.      Sheriff RYALS knew that sheriff deputies routinely encountered domesticated canines while on patrol.

b.      Sheriff RYALS knew that the Sheriff Office's policy of permitting sheriff deputies to shoot pet dogs that were located on private property and that did not present as a credible threat to anyone did not meet the standard in the industry or comply with federal law.

c.      Sheriff RYALS, however, did not implement appropriate policies to govern how sheriff deputies could safely interact with domesticated canines without unnecessarily injuring the animals;

d.      Sheriff RYALS knew that he had not provided sheriff deputies with a non-lethal plan or options regarding how to interact with domesticated canines while on patrol without unnecessarily injuring the animals.

e.      The regularity of such encounters while operating below the industry standard and not in compliance with federal law made the potential for constitutional violations to occur plainly obvious to Sheriff RYALS.

f.      Sheriff RYALS knew that sheriff deputies routinely would need to evaluate whether or not probable cause existed to make warrantless arrests.

g.      Sheriff RYALS knew that the Sheriff Office's policy of permitting sheriff deputies to make warrantless arrests that were not supported by probable cause did not meet the standard in the industry or comply with federal law.

h.      The regularity of such encounters while operating below the industry standard and not in compliance with federal law made the potential for constitutional violations to occur plainly obvious to Sheriff RYALS.

6

i.      Sheriff RYALS knew that sheriff deputies routinely would need to evaluate whether or not it was lawful to point a TASER at persons.

j.      Sheriff RYALS knew that the Sheriff Office's policy of permitting sheriff deputies to point TASERS at persons who did not present as a threat to themselves or others did not meet the standard in the industry or comply with federal law.

k.      The regularity of such encounters while operating below the industry standard and not in compliance with federal law made the potential for constitutional violations to occur plainly obvious to Sheriff RYALS.

l.      Despite it being plainly obvious to Sheriff RYALS that additional and/or different policies and training was necessary to protect civil rights, Sheriff RYALS did not adopt or implement the additional and/or different policies and training.

m.      Had WALLACE been provided with the aforementioned policies and training that at least met the industry standards and complied with federal law, he would have recognized that Reeses was not a threat and that using any force against him, let alone deadly force, was unlawful.

n.      Had WALLACE been provided with the aforementioned policies and training that at least met the industry standards and complied with federal law, he would have recognized that probable cause did not exist to arrest CANADY.

o.      Had WALLACE been provided with the aforementioned policies and training that at least met the industry standards and complied with federal law, he would have recognized that pointing a TASER at CANADY and grabbing his arm was not lawful.

## Count I

**Plaintiffs v. Defendant WALLACE**
**Unlawful Seizure of Personal Property**
**Fourth and Fourteenth Amendments**
**(Pursuant to 42 U.S.C. § 1983)**

37.    Paragraphs 1 through 36 are stated herein by reference.

38.    The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. Amend. IV.

39.    "Effects," as referenced in the Fourth Amendment, includes, personal property. See United States v. Place, 462 U.S. 696, 701 (1983).

40.    A Fourth Amendment "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984).

41.    The destruction of personal property has been determined to be a meaningful interference with an individual's possessory interest in that property. See id. at 124-25.

42.    In Arkansas, privately owned dogs are considered personal property within the meaning of the Fourth Amendment. See Hansen v. Black, 872 F.3d 554, 558 (8th Cir. 2017).

43.    It is undisputed that Reeses' seizure did not occur pursuant to a valid warrant.

44.    Therefore, to determine if Reeses' warrantless seizure was objectively reasonable, "we 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" United States v. Place, 462 U.S. 696, 703 (1983).

45.    According to the industry standards, long standing documentation and records of

8

injuries from dogs in the United States, dog bites that cause "serious bodily injury" are extremely rare, and fatalities are even rarer.

46.    According to the industry standards, the perception that a single dog presents a life-threatening danger to a healthy adult male who is wearing a thick uniform and bullet-proof vest, is objectively unreasonable, and it has been well-documented to be a false perception.

47.    The violent shooting of Reeses, a nine-pound chihuahua in the vicinity of her owner, is a significant intrusion on the Plaintiff's Fourth Amendment interests.

48.    Defendant WALLACE did not have *any* legitimate interest, let alone an important government interest, in shooting Reeses.

49.    Defendant WALLACE is not entitled to immunity, as an objectively reasonable deputy sheriff would have understood that it was unlawful for him to damage a citizen's personal property in the absence of a substantial public interest that would be served by the damage.

50.    Moreover, an objectively reasonable deputy sheriff would know that it is unlawful to use deadly force to respond to a threat of a non-serious injury.

51.    As such, the Defendant is personally liable to the Plaintiff for causing his injuries, which include but are not limited to emotional distress and related physical injuries, and any damage to his personal property.

## Count II

### Plaintiffs v. Defendant WALLACE
### False Arrest - Fourth Amendment
### (Pursuant to 42 U.S.C. § 1983)

52.    Paragraphs 1 through 36 are stated herein by reference.

53.    The Fourth Amendment requires that probable cause exist for a warrantless arrest.

9

U.S. Const. Amend. IV; Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 816 (8th Cir. 2010).

54.    A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime. United States v. Winarske, 715 F.3d 1063, 1066-67 (8th Cir. 2013) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004)).

55.    "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation omitted).

56.    Probable cause to arrest exists if "the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed. . . an offense at the time of the arrest." Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir. 1996) (quotations omitted).

57.    WALLACE pointed a TASER at CANADY and grabbed his arm.

58.    At the time, CANADY had not engaged in criminal conduct and did not present as a threat to himself or others.

59.    As such, WALLACE is liable to the Plaintiff for causing his injuries, which include but are not limited to emotional distress and related physical injuries, and damage to personal property.

10

## Count III

### Plaintiffs v. Defendant WALLACE
### Excessive Force - Fourth Amendment
### (Pursuant to 42 U.S.C. § 1983)

60.     Paragraphs 1 through 36 are stated herein by reference.

61.     "The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures." Coker v. Arkansas State Police, 734 F.3d 838, 842 (8th. Cir. 2013.

62.     The objective reasonableness standard applies to determine whether a law enforcement officer has used excessive force, whether deadly or not, in the course of an arrest. Nance v. Sammis, 586 F.3d 604, 609-10 (8th Cir. 2009); see also Kingsley v. Hendrickson, 576 U.S. 389 (2015); Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009).

63.     To succeed on a claim for excessive force, a plaintiff must prove that: (1) defendant used force on plaintiff; (2) defendant's use of force was unreasonable in the light of the facts and circumstances at the time; (3) defendant knew that using force presented a risk of harm to plaintiff, but defendant recklessly disregarded plaintiff's safety by failing to take reasonable measures to minimize the risk of harm to plaintiff; and (4) defendant's conduct caused some harm to plaintiff. Kingsley, 576 U.S. 389, 393.

64.     WALLACE pointed a TASER at CANADY and grabbed his arm.

65.     At the time, CANADY had not engaged in criminal conduct and did not present as a threat to himself or others.

66.     WALLACE knew that pointing a TASER at a person could cause physical and/or emotional injury but did it anyway despite no legal or factual basis to do so.

11

67.    WALLACE'S conduct caused CANADY to suffer emotional injury.

68.    As such, WALLACE is liable to the Plaintiff for causing his injuries, which include but are not limited to emotional distress and related physical injuries, and damage to personal property.

## COUNT IV

### Plaintiffs v. Defendant Sheriff RYALS
### Fourth and Fourteenth Amendments– Municipal Liability
### (Pursuant to 42 U.S.C. § 1983)

69.    Paragraphs 1 through 36 are stated herein by reference.

70.    A municipal entity can be held liable to a Plaintiff if it can be established that a constitutional injury resulted from the implementation of "official municipal policy." Lozman v. City of Riviera Beach, Florida, 585 U.S. ____ (2018).

71.    Pursuant to Monell, municipal liability exists only if "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 400 (1997) (citing Monell v. Department of Social Services of New York, 436 U.S. at 658, 694 (1978)).

72.    Thus, to establish municipal liability, a Plaintiff must establish that the municipality acted or failed to act in any one of three ways:

73.    First, the municipality adopted an official policy that deprives citizens of their constitutional rights.

74.    Second, the municipality tolerated or adopted an unofficial custom that results in the unlawful stripping of constitutional rights.

12

75.    Third, the municipality failed to train, supervise, or discipline its employees so as to prevent them from unlawfully depriving citizens of their constitutional rights.

76.    Notably, "[a] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" See Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011).

77.    Sheriff RYALS admitted that the policy of the Faulkner County Sheriff's Office was to permit sheriff deputies to shoot pet dogs that were located on private property and that did not present as a credible threat to anyone.

78.    Moreover, Sheriff RYALS admitted that the policy of the Faulkner County Sheriff's Office was to permit sheriff deputies to point TASER'S at persons who did not present as a threat to themselves or others and who were not being lawfully arrested.

79.    Furthermore, Sheriff RYALS admitted that the policy of the Faulkner County Sheriff's Office was to permit sheriff deputies to make warrantless arrests that were not supported by probable cause.

80.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    Sheriff RYALS knew that sheriff deputies routinely encountered domesticated canines while on patrol.

b.    Sheriff RYALS knew that the Sheriff Office's policy of permitting sheriff deputies to shoot pet dogs that were located on private property and that did not present as a credible threat to anyone did not meet the standard in the industry or comply with federal law.

13

c.      Sheriff RYALS, however, did not implement appropriate policies to govern how sheriff deputies could safely interact with domesticated canines without unnecessarily injuring the animals;

d.      Sheriff RYALS knew that he had not provided sheriff deputies with a non-lethal plan or options regarding how to interact with domesticated canines while on patrol without unnecessarily injuring the animals.

e.      The regularity of such encounters while operating below the industry standard and not in compliance with federal law made the potential for constitutional violations to occur plainly obvious to Sheriff RYALS.

f.      Sheriff RYALS knew that sheriff deputies routinely would need to evaluate whether or not probable cause existed to make warrantless arrests.

g.      Sheriff RYALS knew that the Sheriff Office's policy of permitting sheriff deputies to make warrantless arrests that were not supported by probable cause did not meet the standard in the industry or comply with federal law.

h.      The regularity of such encounters while operating below the industry standard and not in compliance with federal law made the potential for constitutional violations to occur plainly obvious to Sheriff RYALS.

i.      Sheriff RYALS knew that sheriff deputies routinely would need to evaluate whether or not it was lawful to point a TASER at persons.

j.      Sheriff RYALS knew that the Sheriff Office's policy of permitting sheriff deputies to point TASERS at persons who did not present as a threat to themselves or others did not meet the standard in the industry or comply with federal law.

14

k.      The regularity of such encounters while operating below the industry standard and not in compliance with federal law made the potential for constitutional violations to occur plainly obvious to Sheriff RYALS.

l.      Despite it being plainly obvious to Sheriff RYALS that additional and/or different policies and training was necessary to protect civil rights, Sheriff RYALS did not adopt or implement the additional and/or different policies and training.

m.      Had WALLACE been provided with the aforementioned policies and training that at least met the industry standards and complied with federal law, he would have recognized that Reeses was not a threat and that using any force against him, let alone deadly force, was unlawful.

n.      Had WALLACE been provided with the aforementioned policies and training that at least met the industry standards and complied with federal law, he would have recognized that probable cause did not exist to arrest CANADY.

o.      Had WALLACE been provided with the aforementioned policies and training that at least met the industry standards and complied with federal law, he would have recognized that pointing a TASER at CANADY and grabbing his arm was not lawful.

81.      As such, Sheriff RYALS is liable to the Plaintiff for causing his injuries, which include but are not limited to emotional distress and related physical injuries, and damage to personal property.

15

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor as follows:

A.    **Declaratory Judgment:** Providing that the Defendants' conduct violated Plaintiffs' Fourth and Fourteenth Amendment constitutional rights;

B.    **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: emotional distress and related physical injuries, and damage to personal property;

C.    **Punitive damages:** Against WALLACE only;

D.    **Equitable Relief:** An admission of the allegations stated in the Complaint in writing, and a written apology from the Defendants for same;

E.    **Attorney's Fees and Costs**; and

F.    **Discretionary Damages and Relief:** Such other financial or equitable relief that the Court deems reasonable and just.

## Jury Trial Demand

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried to a jury.

*Devon M. Jacob*                                    **Date: December 9, 2021**

**DEVON M. JACOB, ESQUIRE**
Bar Number: PA89182
Attorney for Plaintiff
Jacob Litigation, Inc.
P.O. Box 837, Mechanicsburg, PA 17055-0837
Telephone: (717) 796-7733
Email: djacob@jacoblitigation.com

16